383 F.3d 361
 AF-CAP INC., Plaintiff-Appellant,
v.
The REPUBLIC OF CONGO; Defendant-Appellee,
CMS Oil and Gas Co.; et al., Garnishees,
CMS Nomeco Congo Inc.; The Nuevo Congo Co.; Nuevo Congo Ltd., Garnishees-Appellees.
Af-Cap Inc., Plaintiff-Appellant,
v.
The Republic of Congo, Defendant-Appellee.
 No. 03-50506.
 No. 03-50560.
 United States Court of Appeals, Fifth Circuit.
 September 17, 2004.
 
 COPYRIGHT MATERIAL OMITTED Laura Metcoff Klaus, Sanford M. Saunders, Jr. (argued), Greenberg Traurig, Washington, DC, for AF-CAP, Inc.
 Boaz S. Morag (argued), Cleary, Gottlieb, Steen & Hamilton, New York City, for Republic of Congo.
 Guy Stanford Lipe (argued), Vinson & Elkins, Houston, TX, for Garnishees-Appellees.
 Appeals from the United States District Court for the Western District of Texas.
 Before JOLLY and PRADO, Circuit Judges.[1]
 E. GRADY JOLLY, Circuit Judge:
 
 
 1
 This appeal is the second in this case. The Republic of Congo is attempting to avoid its undisputed debt by claiming sovereign immunity under the Foreign Sovereign Immunities Act (FSIA), notwithstanding that, in the Lending Contract, it pledged as collateral all of its assets and properties, and expressly waived its sovereign immunity. The district court concluded that the Congo was entitled to claim immunity under the provisions of the FSIA because the property at issue was not used for commercial purposes in the United States. We disagree and REVERSE and REMAND.
 
 
 2
 * On December 18, 1984, the Republic of Congo entered into a Lending Contract with Equator Bank Limited to provide funds necessary for the construction of a highway in that country. To obtain the loan, the Congo pledged as collateral "all of its assets and properties, wherever located." In the Lending Contract, the Congo expressly waived any right to claim foreign sovereign immunity either from suit or from attachment or execution on its property.
 
 
 3
 The Congo defaulted in 1985. Connecticut Bank of Commerce ("the Bank"), an assignee of the Lending Contract, obtained a default judgment against the Congo in a London, England court. In order to turn this foreign judgment into a United States judgment, the Bank filed suit in a New York state court. The Congo did not appear and the court entered a default judgment in the amount of $13,628,340.11 in favor of the Bank. The New York court also entered an order of attachment, authorizing the Bank to execute against "any assets or other property of the Congo of any nature, irrespective of the use or intended use of such property ... including any ... payments or obligations due to the Congo from any oil and gas exploration and development companies...."
 
 
 4
 On January 11, 2001, the Bank registered the New York judgment in a Texas state court. It then filed garnishment actions there against, inter alia, CMS Nomeco Congo, Inc. ("CMS"), Nuevo Congo Company ("Nuevo"), and Nuevo Congo Ltd. (collectively "the Garnishees"). It sought to garnish intangible property purportedly belonging to the Congo, namely, the Garnishees' obligations to pay taxes and royalties to the Congo. The Garnishees are successors-in-interest to a 1979 joint venture (the "Convention") between a state-owned Congolese company, now known as the Societe Nationale des Petroles du Congo ("SNPC"), and several oil companies for oil production in the Congo. Currently, CMS is the operator of the joint venture while Nuevo, Nuevo Congo Ltd. and SNPC possess working interests. Under the terms of the Convention, the Congo permitted the joint venture to extract oil in exchange for the payment of royalties and a variety of taxes related to the Garnishees' activities. The mining royalty can be paid in cash or in kind from the oil lifted from the wells. The choice regarding the form of payment belongs to the Congo, although it usually elects to have the royalties paid in kind.[2] The Convention also obligates the Garnishees to make periodic tax payments to the Congo based on the net income from covered activities. The remaining profits are split among the Convention members in proportion to their working interests. The Garnishees' obligation to make these tax and royalty payments to the Congo is the property at issue in this case.
 
 
 5
 Following the Bank's filing of its garnishment action in Texas state court, the Congo and the Garnishees (collectively "the Congo Defendants") removed the case to federal court. There, the Congo Defendants moved for dismissal, arguing that the Congo was entitled to sovereign immunity from the garnishment action under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602-1611. In response, the Bank contended that the Congo had expressly waived sovereign immunity in the Lending Contract. The Bank also argued that the Texas court was bound by the earlier attachment order issued by the New York court.
 
 
 6
 The district court dismissed the action, rejecting both arguments of the Bank. First, the court rejected the claim that the New York judgment had any preclusive effect on the present case. The court also rejected the Bank's claim that in the Lending Contract, the Congo had waived sovereign immunity even though it was express and in writing; the court held that such a total waiver was ineffective under § 1610(a) of the FSIA, which recognizes only conditional waivers. Specifically, the court found that even when a foreign state purports to waive completely its immunity, the FSIA only permits execution on property that is "commercial." The court concluded that the royalty and tax payments to the Congo were non-commercial in nature, and thus the property was immune from attachment under § 1610(a).
 
 
 7
 The Bank then appealed to this court. We affirmed the district court's holding that the New York attachment order had no preclusive effect. Connecticut Bank of Commerce v. Republic of Congo, 309 F.3d 240, 248-51 (5th Cir.2002). We also agreed that, under the FSIA, a waiver of immunity only applies "against property that meets ... two statutory criteria," namely, that the property in question be "in the United States" and "used for commercial activity in the United States." Id. at 247 (quoting 28 U.S.C. § 1610(a)). We concluded, however, that the district court had erred in applying these statutory criteria by incorrectly focusing on how the property was generated instead of fully considering what it is "used for."[3] We further clarified this point in an amended opinion issued on rehearing;[4] we remanded the case to the district court with the narrow and specific instructions that it resolve:
 
 
 8
 the dispositive factual question: what the royalty and tax obligations are "used for." If it turns out that the royalties and tax obligations are not used for any commercial activity in the United States, the district court should dissolve the writs of garnishment and dismiss the action.
 
 
 9
 Id. at 260-61.
 
 
 10
 On remand, the district court ordered discovery to determine whether the tax and royalty obligations were property "used for" commercial activity in the United States. Af-Cap, Inc., who had succeeded the Bank in interest during the pendency of the Bank's appeal, vigorously pursued that discovery, receiving thousands of pages of responsive documents and deposing numerous witnesses from the Congo, the Garnishees and non-parties.
 
 
 11
 After hearing arguments, the district court held that the Congo did not use its tax and royalty obligations for commercial activities.[5] Accordingly, it held that this property was not within an exception to immunity and dismissed the garnishment action. Af-Cap has appealed.
 
 
 12
 In this appeal, Af-Cap makes two arguments. First, it contends that the district court erred in disregarding the Congo's express waiver of immunity contained in the Lending Contract. Second, it asserts that the district court erroneously concluded that the royalty and tax payments were not used for commercial activity.
 
 II
 
 13
 We first consider Af-Cap's argument that the district court erred in failing to enforce the explicit waiver of sovereign immunity in the Lending Contract. This argument, however, has already been made and rejected in the earlier appeal. In the first appeal, Af-Cap's predecessor cited the same language in the Lending Contract, arguing that it permitted execution against "any property whatsoever," "irrespective of its use or intended use." It argued that even if this violated the express restrictions under the FSIA, these restrictions were inapplicable because (1) the Congo signed a contractual waiver in the Lending Contract and (2) the New York court's order should be given preclusive effect. Although most of our opinion in the earlier appeal focused on rejecting the latter of these claims, we explicitly rejected the former claim as well. We noted:
 
 
 14
 The Foreign Sovereign Immunities Act provides foreign sovereigns with immunity from execution against their property to satisfy an adverse judgment. This statutory immunity is subject to several exceptions. One exception is that, if a foreign sovereign waives its immunity from execution, U.S. courts may execute against "property in the United States ... used for a commercial activity in the United States." 28 U.S.C. § 1610(a)(1). Even when a foreign state completely waives its immunity from execution, courts in the U.S. may execute only against property that meets these two statutory criteria. Connecticut Bank, 309 F.3d at 247 (internal citations removed and emphasis added).
 
 
 15
 Our mandate on remand also showed that we had rejected this argument. We gave narrow and specific instructions to the district court, directing it to decide the "dispositive factual question" of whether the Congo's property is "used for any commercial activities in the United States," and to dismiss the action if it was not. Id. at 260-61.
 
 
 16
 Af-Cap contends that this interpretation of the FSIA is incorrect and that the FSIA does in fact permit a complete waiver of sovereign immunity. Whatever the validity of that claim, however, we are obligated to accept the ruling of the earlier panel. "On second appeal following remand, the only issue for consideration is whether the court below reached its final decree in pursuance of [this court's] previous mandate." Burroughs v. FFP Operating Partners, L.P., 70 F.3d 31, 33 (5th Cir.1995). Thus, "this Court will not reconsider issues decided by the prior panel." Id. Under the law of the case doctrine, "an issue of fact or law decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal." St. Paul Mercury Ins. Co. v. Williamson, 332 F.3d 304, 309 (5th Cir.2003). Accordingly, the only question properly before this panel on this second appeal is "whether the court below reached its final decree in pursuance of [this court's] previous mandate." Burroughs, 70 F.3d at 33.[6] That is, our present authority is limited to examining whether the district court correctly determined that the tax and royalty obligations at issue here are not used for commercial purposes in the United States. We now turn to this question.
 
 III
 
 17
 * As discussed previously, in our earlier opinion following the first appeal in this case, this court held that under § 1610(a) of the FSIA, a court is prohibited from executing against the property of a foreign state unless that property is: (1) in the United States; and (2) used for commercial activity in the United States. Connecticut Bank, 309 F.3d at 247. We first turn to an analysis of the district court's determination that these tax and royalty obligations were not used for commercial purposes in the United States.
 
 
 18
 Before doing so, we must first make clear the applicable standard of review in this case. Determining whether property is used for commercial purposes requires a court to both make factual findings concerning how the property was used and to reach legal conclusions concerning whether that particular use was "for commercial purposes." When a district court's decision involves such mixed questions of law and fact, we review the district court's factual findings for clear error, and its legal conclusions and application of law to fact de novo. In re Liljeberg Enterprises, Inc., 304 F.3d 410, 424 (5th Cir.2002).
 
 
 19
 We find no clear error in the district court's material factual findings concerning the Congo's past use of these royalty obligations. The district court found, and the Congo concedes, that it has, in the past, utilized these tax and royalty obligations for an explicitly commercial purpose. In 1989, the National Union Fire Insurance Company ("NUFI") obtained a judgment against the Congo after the Congo defaulted on a $26,425,000 loan. Two years later, in 1991, NUFI sued the Congo in federal court in an effort to collect its judgment by garnishing the same tax and royalty obligations that are at issue in this case. NUFI and the Congo eventually entered into a settlement agreement under which the Congo assigned NUFI fifty percent of these tax and royalty obligations until such a time as the underlying debt was fully paid. Significantly, this money was paid by the Garnishees directly to NUFI; the Garnishees would then pay the remaining amount of royalties due to the Congo. This arrangement went on for over eleven years — until August 2002 — until the multi-million dollar debt was paid. The Congo has also acknowledged that, although these tax and royalty obligations were actually used in this fashion only once, the Congo seriously contemplated using these obligations in a similar manner on at least one other occasion. Around the time the NUFI settlement was set to expire, the Congo entered into settlement discussions with another creditor wherein a similar assignment of debt was proposed, albeit ultimately not adopted.
 
 
 20
 Because we find no clear error in the district court's material factual findings, the question before this court is a strictly legal one: whether such past commercial use is sufficient to render these obligations "property used for commercial purposes" for purposes of the FSIA. The Congo Defendants argue that it is not. They contend that "an exceptional and singular" past commercial use at one point in time is insufficient to establish that this specific property is used for commercial purposes under the FSIA. Instead, they contend that the FSIA warrants a more comprehensive approach to the question of commercial use, focusing not on isolated and unusual uses, but instead on what the property is "essentially used for."
 
 
 21
 The district court agreed that the Congo Defendants' recommended approach was consistent with the legislative purpose of the FSIA. The court noted that there was little case law delineating precisely how a court should analyze property to determine whether it was being used for commercial purposes under the FSIA, but reasoned that evidence of a single commercial use in the past could not, by itself, render the property in question now and forever subject to garnishment. Instead, the district court applied a form of the Congo Defendants' recommended "essential use" test, focusing on determining the predominant or essential use of the property in question. Concluding that the "single instance" of tax and royalty obligations being used to satisfy a commercial debt was not enough to render the property essentially commercial in nature, the district court dismissed the action.
 
 
 22
 We have no major disagreement with the analytical approach that the able district court adopted in determining whether these tax and royalty obligations were commercial in nature. Like the district court, we have similar reservations about defining property use as commercial in nature solely by reference to past single and/or exceptional commercial uses. Instead, we agree that determining the commercial (or non-commercial) status of a property's use requires a more holistic approach. Specifically, we think that an analysis applied to such a question should examine the totality of the circumstances surrounding the property. This analysis should include an examination of the uses of the property in the past[7] as well as all facts related to its present use, with an eye toward determining whether the commercial use of the property, if any, is so exceptional that it is "an out of character" use for that particular property.[8]
 
 
 23
 This holistic approach is also consistent with the reasoning in our earlier decision in this case. There, Af-Cap's predecessor argued that courts should look at the source as opposed to the use of the property to determine its commercial nature. In rejecting this contention, we utilized the following analogy:
 
 
 24
 Consider an airplane owned by a foreign government and used solely to shuttle a foreign head-of-state back and forth for official visits. If the plane lands in the United States, it would not be subject to attachment or execution. The plane is not "used for" any commercial activity, in the U.S. or elsewhere. It plainly would not matter how the foreign government bought the plane, raised the purchase price, or otherwise came into ownership. Even if the government received the plane as payment from a U.S. company in an obviously commercial transaction, that would not somehow transform the "use" of the plane into a commercial use. Regardless of how the government came to own the plane, a U.S. court could never under the terms of the FSIA confiscate a plane used solely to transport a foreign head-of-state on official business. Attaching the plane and selling it in execution of a judgment would go too far in interrupting the public acts of a foreign state.
 
 
 25
 Connecticut Bank, 309 F.3d at 253.
 
 
 26
 Tweaking this analogy a bit, consider that the airplane had been used on rare occasions for commercial activities — for example, it was temporarily used to fill in for a disabled plane in the foreign country's commercial fleet. It would strain reason to conclude that these limited, emergency usages rendered the plane subject to garnishment now and forever irrespective of the fact that its use was otherwise almost exclusively non-commercial. Indeed, permitting the attachment and selling of such a plane in execution of a judgment would also "go too far in interrupting the public acts of a foreign state." Thus, we conclude that under the FSIA, foreign property retains its immunity protection where its commercial uses, considered holistically and in context, are bona fide exceptions to its otherwise noncommercial use.[9]
 
 
 27
 That said, although we are fairly in agreement with the form of the analysis applied by the district court, and dispute none of its underlying fact determinations, we disagree with its legal conclusion that these tax and royalty obligations were not used for commercial purposes. Instead, we think that the facts relating to the past and present use of these obligations, examined broadly and in context, establish the opposite.
 
 
 28
 As the facts of the NUFI settlement indicate, for nearly half of the twenty-four years that these obligations existed, the Congo has used at least fifty percent of them to repay a commercial debt. The amount of the debt repaid was not insignificant; during the course of this extended period of time, over $26,000,000 was diverted from these obligations to the Congo's commercial creditor. Such a continuing, extended and monetarily significant use is neither exceptional nor de minimis. Moreover, it is difficult to say that execution on this obligation would be so unusual that it would shock and disrupt the public affairs of the Congo.[10]
 
 
 29
 Indeed, on at least one other occasion, the Congo contemplated engaging in the same type of use again. Although such contemplated use is not actual use,[11] it is strongly suggestive that the proceeds of these tax and royalty obligations were not cordoned off for use of the Congo in its sovereign capacity. Instead, it indicates the availability of this property for whatever purpose — commercial or otherwise — the Congo deems appropriate. Such property seems hardly the type of foreign property the FSIA was designed as a shield to protect, i.e., funds so central to a nation's operations as a sovereign that uses thereof would "interrupt[ ] the public acts of [this] foreign state." Id. at 253. Accordingly, we conclude that these tax and royalty obligations are used for commercial purposes for purposes of § 1610(a) of the FSIA.
 
 B
 
 30
 We now turn to the question of the situs of these tax and royalty obligations. As noted previously, for foreign property to be stripped of its immunity under the FSIA, § 1610(a) not only requires that the property in question be used for commercial purposes, but also that the property be "in the United States." Id. at 247.[12]
 
 
 31
 Determining the situs of the property at issue here poses a special problem because this property is intangible in nature. This court and others have noted the inherent difficulty of assigning a location to property that by its very definition "lacks a physical existence." See BLACK'S LAW DICTIONARY 1233 (7th ed.1999). The Third Circuit has observed that attaching a situs to intangible property is necessarily a legal fiction; therefore, the selection of a situs for intangibles must be context-specific, embodying a "common sense appraisal of the requirements of justice and convenience in particular conditions." U.S. Industries, Inc. v. Gregg, 540 F.2d 142, 151 n. 5 (3rd Cir.1976) (citations and quotations removed). This court has also recognized the context-specific nature of an inquiry into the situs of intangible property. In Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co., 392 F.2d 706, 714 (5th Cir.1968), after noting that "[t]he situs of intangible property is about as intangible a concept as is known to the law," we affirmed that the situs of intangible property will vary, depending on the context. Thus:
 
 
 32
 The situs may be in one place for ad valorem tax purposes,...; it may be in another place for venue purposes, i.e., garnishment ...; it may be in more than one place for tax purposes in certain circumstances ...; it may be in still a different place when the need for establishing its true situs is to determine whether an overriding national concern, like the application of the Act of State Doctrine is involved.
 
 
 33
 Id. at 714-15 (citations omitted).
 
 
 34
 We think a "common sense appraisal of the requirements of justice and convenience" in this particular context yields the conclusion that the situs of these royalty obligations is the United States — the situs of the Garnishees. This conclusion is consistent with the application of the rule ordinarily applied to determine the situs of debtor obligations like these tax and royalty obligations. Specifically, courts consistently hold that the situs of a debt obligation is the situs of the debtor.[13] This is certainly true in Texas, where this garnishment proceeding commenced. See, e.g., Mo., Kan. & Tex. Ry. Co. of Tex. v. Swartz, 53 Tex.Civ.App. 389, 392, 115 S.W. 275, 276 (1908, no writ)(holding that the situs of a debt obligation is the situs of the debtor). This same rule is also applied in other states. See, e.g., Alliance Bond Fund v. Grupo Mexicano De Desarrollo, 190 F.3d 16, 25 n. 9 (2d Cir.1999) (recognizing this rule generally applies under New York law); Great Falls Transfer & Storage Co. v. Pan Am. Petroleum Corp., 353 F.2d 348, 349 (10th Cir.1965) (recognizing the same under the laws of Montana and Wyoming). Furthermore, this rule's general operation has been recognized by the Supreme Court. See, e.g., Harris v. Balk, 198 U.S. 215, 221-22, 25 S.Ct. 625, 49 L.Ed. 1023 (1905).
 
 
 35
 We acknowledge that in these foregoing cases, the courts were determining situs for the purpose of establishing jurisdiction over property subject to a garnishment action, whereas in this case we are considering situs for purposes of determining immunity under the FSIA. The Congo Defendants seize on this distinction, arguing that a different sort of situs calculus should apply in the FSIA context as questions that purely concern jurisdiction do not implicate delicate issues concerning the availability of foreign sovereign immunity and comity between nations.[14]
 
 
 36
 While we agree that the two contexts implicate different issues and interests, we think that these differences are immaterial for present purposes, as we see nothing about the general rule regarding the situs of debt obligations that would frustrate the purpose of the FSIA, which is to "limit as much as possible disrupting the `public acts' or `jure imperii' of sovereigns." Connecticut Bank, 309 F.3d at 253. Specifically, we fail to see how permitting Af-Cap to execute against intangible commercial debt obligations owed by business entities formed and headquartered in the United States "interrupts [the Congo's] public acts," particularly when the Congo has proven more than willing to divert these obligations directly to its commercial creditors in the United States. Id. Indeed, in an earlier case, we rejected the notion that enforcing general rules (like the rule establishing the situs of debtor obligations here) against the commercial activities of foreign nations would inappropriately interfere with their sovereignty. We stated:
 
 
 37
 In their commercial capacities, foreign governments do not exercise powers peculiar to sovereigns. Instead, they exercise only those powers that can also be exercised by private citizens. Subjecting them in connection with such acts to the same rules of law that apply to private citizens is unlikely to touch very sharply on "national nerves."
 
 
 38
 de Sanchez v. Banco Central de Nicaragua, 770 F.2d 1385, 1391 (5th Cir.1985) (quoting Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 703-04, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976)).
 
 
 39
 Finally, the interests for which the Congo urges protection from "interruption" are in fact protected by the FSIA itself — if the property is used for sovereign purposes and not for commercial use, then there can be no action for garnishment in the United States.
 
 
 40
 Seeing no conflict between the application of this ordinary situs rule and the purposes and goals of the FSIA, we conclude that this same rule should apply in this context relating to property used commercially. Accordingly, we hold that the situs of these tax and royalty obligations is the United States.[15]
 
 IV
 
 41
 To sum up: We hold that the district court correctly applied the law of the case doctrine to reject Af-Cap's argument that the Congo waived fully its claim of sovereign immunity pursuant to the Lending Agreement. We further hold, however, that the district court erred in concluding that the tax and royalty obligations at issue in this case were not used for commercial purposes in the United States. We also hold that the situs of these obligations is the United States. We have thus determined that both these FSIA conditions have been satisfied. These tax and royalty obligations therefore are not protected by sovereign immunity. It follows that the district court erroneously dismissed Af-Cap's cause of action and dissolved the writs of garnishment obtained by Af-Cap against the Garnishees. We therefore REVERSE the judgment and REMAND for further proceedings not inconsistent with this opinion.
 
 
 42
 REVERSED and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 This matter is decided by a quorumSee 28 U.S.C. § 46(d).
 
 
 [2]
 The Convention specifies a method for how these royalties are to be paid on an in-kind basis. After being produced at offshore wells, the oil flows through a subsurface pipeline system to an offshore storage facility, a retired transport tanker called the "CONKOUATI," which is located in Congolese waters. Once the CONKOUATI is filled with between 550,000 and 600,000 barrels of oil, CMS and Nuevo take a "lifting" and sell the oil. Throughout this process, CMS keeps an over/under accounting of the amount of oil it has lifted and sold, and notes the Congo's royalty entitlement and SNPC's working entitlement under the Convention. CMS and Nuevo continue to take liftings and sell the oil until the combination of the Congo's royalty entitlement and SNPC's working-interest entitlement exceeds 275,000 barrels. At this point, SNPC takes a lifting and sells the oil. In this way, both the Congo's in-kind royalty and tax entitlement and SNPC's working interest are satisfied. Apparently, when SNPC conducts such a lifting, it lifts about 550,000 to 650,000 barrels, at which point it is "over-delivered," which is then accounted for in the over/under accounting described above. SNPC would then not take another lifting until it is under-delivered by 275,000 barrels
 
 
 [3]
 Specifically, we held that the district court erroneously had focused its primary attention on whether the source of the royalties and tax obligations — in this case, the joint venture — was a commercial activity. Instead, the district court should have focused on the use of the property itself: "The amenability of these royalties and taxes to garnishment depends on what they are `used for', not on how they were raised."Connecticut Bank, 309 F.3d at 251.
 
 
 [4]
 The amended opinion contained a more detailed discussion of the application of the "used for" criterion under the FSIA
 
 
 [5]
 Because the district court found that the property at issue did not satisfy the "used for" prong of § 1610(a), the district court declined to address whether the "situs of the obligations" is "in the United States," the second statutory criterion under § 1610(a)
 
 
 [6]
 Af-Cap correctly points out that the law of the case is a discretionary, not jurisdictional, doctrine and can be ignored if a prior holding is "clearly erroneous and would work a manifest injustice." However, as evidenced by the cases Af-Cap cites in support of this proposition, courts rarely invoke this exception to the law of the case doctrine and when they do, it is because of post-decision changes in evidentiary facts or in the applicable law andnot because the subsequent panel disagreed with the earlier panel's legal conclusions. See Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) (refusing to reexamine previous factual findings despite an alleged change in factual circumstances); Tollett v. City of Kemah, 285 F.3d 357, 365-66 (5th Cir.2002) (refusing to reexamine an earlier panel's conclusion following the submission of allegedly new evidence at a district court's hearing on remand); U.S. v. Matthews, 312 F.3d 652, 657-58 (5th Cir.2002) (agreeing to reexamine original panel's legal conclusions where those legal conclusions had been called into question by a subsequent Supreme Court decision).
 Notably, Af-Cap cites no cases where a subsequent panel reversed a prior panel's legal conclusion solely because the subsequent panel disagreed with it. The absence of such cases should not be surprising. The subsequent panel would not only have to forego application of the law of the case doctrine, but would also have to discard the well-established rule that circuit panels are "bound by the precedent of previous panels absent an intervening ... case explicitly or implicitly overruling that prior precedent." U.S. v. Short, 181 F.3d 620, 624 (5th Cir.1999).
 
 
 [7]
 We disagree with the district court's alternative holding that evidence of past commercial use cannot be considered for purposes of establishing the commercial or non-commercial nature of property under the FSIA. According to the court, § 1610(a) only applies to "present and impending uses." Instead, we think that the consideration of evidence of past use is an indispensable part of a court's FSIA inquiry. A court forbidden to consider how property has been used in the past would be hard-pressed to accurately determine whether the predominant use of that property is commercial or sovereign
 
 
 [8]
 In this analysis, we also think it would be appropriate for a court to consider whether the use of the property in question was being manipulated by a sovereign nation to avoid being subject to garnishment under the FSIA
 
 
 [9]
 This conclusion also squares with the logic of a case quoted approvingly by this court in its earlier decision in this case. InEastern Timber Corp. v. Republic of Liberia, 659 F.Supp. 606 (D.D.C.1987), the property at issue was a Liberian bank account primarily used to fund diplomatic and consular activities, though some portion of the account had been used for commercial activities. The Eastern Timber court, however, determined that the account was still immune from execution, explaining that it "decline[d] to order that if any portion of a bank account is used for commercial activity, then the entire account loses its immunity." Id. at 610.
 
 
 [10]
 In support of their contention that the use here was exceptional, the Congo Defendants rely heavily on the district court's legal characterization of this use as "single." While rhetorically powerful, this characterization is somewhat misleading. Indeed, this use is "singular" only in that it was used to satisfy a single debt. In its other aspects, the use was frequent, ongoing, and longstanding
 
 
 [11]
 The Congo Defendants contend that inConnecticut Bank, this court held that merely "contemplated" commercial uses are not relevant factors in a court's determination of whether property was used for commercial purposes for purposes of the FSIA. This, however, is a mischaracterization of our holding in that case. Our discussion of "contemplated" use in Connecticut Bank occurred not in the context of determining which types of uses are properly considered in an FSIA commercial use analysis, but instead in the context of rejecting the argument that property that is "generated by" or "contemplated by" commercial activities is also used for commercial purposes under § 1610(a). See Connecticut Bank, 309 F.3d at 258-60. We said nothing in Connecticut Bank about the appropriateness or inappropriateness of a court examining evidence of the contemplated uses of particular property as part of its inquiry into whether the property is used for commercial purposes. Indeed, we think that, as here, examining evidence of contemplated commercial use would greatly aid a court in making a determination of the general commercial or non-commercial nature of particular property.
 
 
 [12]
 Even though the district court did not address the question of situs, we need not remand because the question here is one of law based on a fully developed record in which there are no material factual disputes
 
 
 [13]
 The Congo Defendants attempt to avoid the conclusion that these tax and royalty obligations are debt obligations by attempting to fix a physical location to them. Specifically, they point to the fact that the Convention permits the Congo to elect how these royalties will be paid and the Congo always elects to have them paid in kindSee n.1 infra. They thus essentially contend that the property at issue here is actually the oil stored in a tanker in Congolese waters. Because this oil is located in the Congo, they argue that the Congo is the situs of these tax and royalty obligations. This contention is flawed for two principal reasons. First, it cannot be squared with the facts surrounding the use of these tax and royalty obligations; as we have previously noted, under the NUFI settlement, for nearly half of the Convention's existence, at least half of these obligations were diverted in the form of cash payments to the Congo's creditor. Notably, this diversion did not involve the Congo drawing oil from the tanker, selling it, and then paying fifty percent of the proceeds directly to the creditor; instead, these debt payments passed directly from the Garnishees, who resided in the United States, to the NUFI creditor, which also resided in the United States. This fact alone seems sufficient to defeat the Congo Defendants' argument that these obligations are somehow physically located in the Congo. However, the Congo Defendants' implicit suggestion that the tax and royalty obligations that Af-Cap is seeking to garnish have a physical location is itself fatally flawed. Here, Af-Cap is not seeking to attach any of the Congo's physical property (like its oil) but instead it seeks to attach the obligations to pay royalties owed by the Garnishees. As noted previously, such debtor obligations are intangible assets, which by definition have no physical existence. For these reasons, the Congo Defendants' attempt to essentially ascribe a physical existence to them fails.
 
 
 [14]
 The Congo Defendants also argue that the act of state doctrine should apply; this means that the situs of foreign debt obligations must be the foreign country because a contrary conclusion would improperly "antagonize the foreign government." However, the act of state doctrine is inapplicable in this context. As the Supreme Court, and this court, have made clear, the act of state doctrine applies only when the dispute implicates the legitimacy of public acts undertaken by a sovereign nationSee Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (holding that the act of state doctrine prevented the court from reaching the merits of a dispute over sugar cane seized pursuant to the Cuban government's decision to nationalize the sugar industry); Callejo v. Bancomer, S.A., 764 F.2d 1101, 1112-24 (5th Cir.1985) (invoking the doctrine in refusing to intervene in a dispute implicating the legitimacy of Mexico's promulgation of exchange control regulations). Because this case does not involve such a public act, but rather a mere dispute over the payment of a debt the Congo does not dispute that it owes, the act of state doctrine does not apply.
 
 
 [15]
 The Congo Defendants cite two district court cases from other circuits in support of their claim that a different type of situs calculus should apply in the present contextSee Raccoon Recovery LLC v. Navoi Mining & Metallurgical Kombinat, 244 F.Supp.2d 1130 (D.Colo.2002); Fidelity Partners, Inc. v. Philippine Exp. & Foreign Loan Guarantee Corp., 921 F.Supp. 1113 (S.D.N.Y.1996). Aside from the fact that neither case is binding on us, both are distinguishable as neither involved debt obligations, but rather other forms of intangible property. In Raccoon Recovery, a judgment creditor sought to execute upon a judgment debtor's partnership interest in an Uzbekistan mining operation under a Colorado law allowing it to do so. 244 F.Supp.2d at 1142. In Fidelity, the property at issue was a foreign state's bank deposits maintained and controlled exclusively at a bank headquartered in that foreign country. 921 F.Supp. at 1119.